IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JONI SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-1241-N (BH) |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before this Court are Plaintiff's *Motion for Summary Judgment and Memorandum in Support*, filed December 5, 2008; the Commissioner's *Motion for Summary Judgment* and *Memorandum in Support*, filed January 5, 2009; and Plaintiff's *Reply to Defendant's Motion for Summary Judgment and Brief in Support*, filed January 26, 2009. Based on the filings, evidence and applicable law, Plaintiff's *Motion for Summary Judgment* should be **GRANTED**, the Commissioner's *Motion for Summary Judgment* should be **DENIED**, and the final decision of the Commissioner should be **REVERSED** and **REMANDED**.

## I. BACKGROUND[1]

### A. Procedural History

Joni Smith ("Plaintiff") seeks judicial review of a final decision by the Commissioner of

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Social Security ("Commissioner"), denying her claim for disability benefits. Plaintiff filed an application for disability benefits under Title II and Title XVI of the Social Security Act on February 22, 2006. (Tr. at 9). Plaintiff claimed she had been disabled since April 12, 2005, due to bipolar disorder and manic depression. (Tr. 9, 152). Her application was denied initially and upon reconsideration. (Tr. at 78, 89). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 9). A hearing, at which Plaintiff personally appeared and testified, was held on June 18, 2007. (Tr at 20). The ALJ issued her decision on November 16, 2007, finding plaintiff not disabled. (Tr. at 9-19). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 2-3). The ALJ's decision became the final decision of the Commissioner. (Tr. at 2). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on July 21, 2008.

**B.      Factual History**

      **1.      Age, Education, and Work Experience**

Plaintiff was born in 1958 and was 49 years old at the time of the hearing. (Tr. at 17, 28). She is a high school graduate. (Tr. at 24). Plaintiff has no significant past relevant work experience. (Tr. at 17, 70).

      **2.      Medical Evidence**

Plaintiff struggled with drug addiction throughout the 1990s. (Tr. at 537). During that time period, however, she experienced some periods of sobriety. *Id.* In 2005, Plaintiff experienced another drug relapse. (Tr. at 293). Records of psychiatric treatment from ABC Behavioral Health ("ABC") in Dallas, Texas provide some of Plaintiff's relevant medical history. (Tr. at 293). During

a psychiatric evaluation conducted by ABC in June 2005, Plaintiff reported that she heard voices, had trouble sleeping, and that her mind raced. *Id*. Plaintiff also reported that before she relapsed, she was taking psychiatric medications that had "worked very well for her and [had] stabilized her mood and symptoms." *Id*. During her treatment at ABC, Plaintiff was diagnosed with drug abuse and depression and was placed on a medication regimen. (Tr. at 296).

In December 2005, Plaintiff tested positive for cocaine and was admitted to Turtle Creek Manor, a residential drug rehabilitation center in Dallas, after being diagnosed with recurrent major depressive disorder and cocaine dependence. (Tr. at 514, 518). Her clinician at Turtle Creek Manor added Citalopram, an antidepressant, to her drug regimen. (Tr. at 518). A few days later, a review conducted by staff at Turtle Creek Manor noted that Plaintiff seemed less depressed, more engaged, and had improved levels of social functioning. (Tr. at 515-16). Plaintiff also tested negative for drugs. (Tr. at 511). While an inpatient at Turtle Creek Manor, Plaintiff attended a number of group therapy sessions. (Tr. at 475-502). Notes from her counselors during these sessions reveal that her appearance, behavior, mood, and cognitions were within normal limits, and that she represented no danger to herself or to others. *Id*. Additionally, she appeared to be attentive, responsive, and "worked well" with her peers on assigned projects. *Id*. Medical records from January, 2, 2006, note that Plaintiff was "exhibiting borderline characteristics" and "trying to wrap every counselor up in her drama." (Tr. at 482). The records also note that Plaintiff's medication was altered when she complained about it. *Id*. On January 7, 2006, Plaintiff again tested negative for drugs. (Tr. at 503). On January 9, 2006, Plaintiff reported to her counselor that she was offered a job in Grand Prairie, a suburb of Dallas, but did not accept the position because she felt it was "too far away" from Dallas. (Tr. at 476).

On January 14, 2006, Plaintiff was given a structured clinical interview for psychiatric disorders. (Tr. at 444). The interview resulted in diagnoses of bipolar I disorder, cocaine dependence, alcohol abuse, stimulant abuse, and post traumatic stress. (Tr. at 444-51). Additionally, as a result of the interview, Plaintiff was assigned a global assessment functioning value of 33 on a scale of 0 to 100. (Tr. at 452). The value 33 was described as "some impairment in reality testing or communication...or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id*. Plaintiff was discharged from Turtle Creek Manor on January 19, 2006. (Tr. at 476).

After her discharge from Turtle Creek Manor, ABC resumed management of Plaintiff's treatment and medication. (Tr. at 261-285). Treatment records from that time period indicate that Plaintiff still heard voices. (Tr. at 273-283). Progress notes from February 2006 reveal that Plaintiff was off her medication for about a week. (Tr. at 285). Another progress report from March 2006 notes that Plaintiff's medications worked well and without any side effects, the "voices [were] much better," and Plaintiff got better sleep. (Tr. at 346). In May 2006, Plaintiff's diagnosis was changed to schizoaffective disorder, cocaine abuse, and alcohol abuse, and she was reported to have "suicidal ideations" as well as problems with "communication, appropriate boundaries, [and] interpersonal relationship skills." (Tr. at 262-63, 266). In June 2006, Plaintiff reported that she was off her medications. (Tr. at 275). The following month, Plaintiff complained that she was not sleeping well. (Tr. at 273). Plaintiff regularly tested negative for drugs during her treatment at ABC. (Tr. at 261-285).

### 3. Hearing Testimony

A hearing was held before the ALJ on June 18, 2007. (Tr. at 20). Plaintiff, her counsel, a

medical expert, and a vocational expert attended the hearing. *Id*.

### a. Plaintiff's Testimony

Plaintiff testified that she was 49 years old and was living at her friend's apartment. (Tr. at 28, 57). She finished high school and received vocational training as a cashier. (Tr. at 28, 24). She testified that she had not worked since April 12, 2005. *Id*. Plaintiff testified that she had worked for twenty-three different employers in fourteen years and had been fired from most of these jobs for being too slow. (Tr. at 26-27). Plaintiff also testified that she had memory problems and was fired from Waffle House because of her inability to remember different food names. (Tr. at 27). She was unable to procure a job at Compass Group in 2004 because she failed a memory and math test. (Tr. at 28).

With regards to her medical problems, Plaintiff testified that she had bipolar disorder, schizophrenia, paranoia, and post traumatic stress disorder. (Tr. at 28-29). Plaintiff testified that before receiving her diagnosis of bipolar disorder, she heard voices and could see herself sitting in a corner. (Tr. at 29). Around this time she started drinking and experimenting with drugs and had difficulty sleeping. *Id*. After her mental diagnoses and commencement of medication, her functioning improved, her eating became normal, and she changed her pattern of alcohol and drug experimentation. (Tr. at 29-31). Plaintiff testified that she had not experimented with alcohol and drugs for over two years. (Tr. at 30). She further testified that her sleep medication helped her get a full night of sleep, but that it increased her appetite and left her tired and groggy. (Tr. at 31).

Plaintiff testified that because of her sleep medication, her energy level was generally low and that she could not walk more than a few city blocks. (Tr. at 33). Her diagnosis of bipolar disorder and schizophrenia had led to embarrassment, low self-esteem, and sometimes depression.

(Tr. at 34). Her sleep medication had reduced the duration of her manic cycle from a week down to three days, and that she was not manic as much. (Tr. at 35). During her manic cycle, she experienced high energy levels leading to constant movement, but when she crashed, she "[came] down hard." (Tr. at 34). As a result, she was too tired to even get up to remove her clothes. *Id*. Additionally, her mind raced, she lost concentration, she spoke louder and faster than normal, and she was unable to focus on reading or watching television. (Tr. at 35). Her memory also weakened to a point where she forgot doctor's appointments and got distracted while cooking. (Tr. at 37). She stuck to her medication regimen with the help of a list that she kept in the house, however. *Id*.

Plaintiff testified that she thought about suicide every day because of her past experiences and the lack of a family or purpose in life, but that she had never acted on these thoughts. (Tr. at 38, 39). She also thought of hurting people sometimes, for example, when they "[laid] their hands on her" in trying to be "chummy." (Tr. at 39). She once got into a fight with a lady at work and hit her in retaliation. *Id*. As a result, she was fired from the job. *Id*. Plaintiff had hallucinations and saw her deceased mother and sometimes herself out of her body. (Tr. at 40). However, the out-of-body hallucinations stopped because of her medications. (Tr. at 41). She also heard voices in her head, one of which told her to hurt herself in a very strong and loud voice. (Tr. at 41). Because of her medications, the voices were no longer as intense or loud. (Tr. at 43). She stopped going to church because she perceived the loud praying at the church as adding to the voices in her head. (Tr. at 44). During one particular visit, when she was asked to go to the front of the church to receive a prayer, she experienced a panic attack and had to leave. (Tr. at 43-44).

Plaintiff testified that she had been sexually abused by her father when she was younger. (Tr. at 45). She got very scared when startled. (Tr. at 46). She did not have a driver's license and

had to ride the bus. *Id*. If a bus got overcrowded, she got nervous and paranoid and wanted to exit. *Id*. Plaintiff had never married for fear that her bipolar disorder, schizophrenia, and paranoia might scare off her partner. (Tr. at 47). She attended Narcotics Anonymous and Alcoholics Anonymous meetings sometimes, but hesitated to drink or eat at those meetings because of her distrust for people. (Tr. at 48-49). She got along well with people but preferred to be by herself. (Tr. at 49). She had given up video games, roller-skating, movies, and pool because she preferred the quiet of her home. (Tr. at 50).

Plaintiff further testified that she had injured her knee when she slipped and fell while working at Whataburger. *Id*. She added that her right knee and ankle swelled up upon extended periods of standing. *Id*. While walking, her ankle would sometimes give out, causing her to fall, or her knee would start aching or throbbing. (Tr. at 51). She could stand without support from thirty minutes to one hour at a time. *Id*. Depending on the kind of chair, her lower back also would hurt. *Id*. She was able to carry a 10 pound bag but not a 20 pound bag over short distances, because of the effect on her back and an intense cramp in her fingers. (Tr. at 52). Plaintiff could cook for herself sometimes. *Id*. She could clean her friend's apartment but would not get to finish a specific job such as cleaning the bathroom or making the bed in one sitting because of her tendency to get distracted. (Tr. at 56).

Plaintiff testified that she would prefer to work if she did not have bipolar disorder and schizophrenia. (Tr. at 54). She saw a psychiatrist and a counselor at ABC once a month, mostly during group sessions. *Id*. At other times, she went to ABC just to get out of the house and be around other bipolar people in the program. *Id*. She did not go often because some of the people in the program argued and picked on her. (Tr. at 55). Plaintiff suffered a relapse in cocaine use in

December of 2005 while being treated at ABC. (Tr. at 57). She also falsely reported a cocaine relapse to Turtle Creek in order to get herself off the streets at the time. (Tr. at 58). She underwent a 12-step recovery program at Narcotics Anonymous and Alcoholics Anonymous. *Id*.

### b. *Medical Experts' Testimony*

Dr. Magarahan, a medical expert ("ME"), testified at the hearing that based on the record, Plaintiff had a history of alcohol and cocaine abuse, post traumatic stress disorder, and a schizoaffective disorder, resulting from her depression, mania, and other associate psychotic features. (Tr. at 59-60). The ME added that medical records indicated some primary solace counseling as well as treatment received at ABC up to the time of the hearing. (Tr. at 59). He testified that Plaintiff had been on several medications for her condition and that she was responding well to them, especially since her remission in December 2005. (Tr. at 60). The most recent medical records indicated that Plaintiff's medications significantly helped with, but did not completely ameliorate, the voices she heard. *Id*. The ME opined that Plaintiff's daily living activities were mild to moderate; her concentration and persistence of pace was moderate, her social functioning was moderately impaired, and there were no decompensation episodes of extended duration. (Tr. at 61). He concluded, based on these limitations, that Plaintiff could perform simple repetitive work that she learned in 30 days. *Id*.

Upon cross-examination by Plaintiff's attorney, Dr. Magarahan testified that Plaintiff's history of getting fired from a majority of her jobs for her work pace, if supported by evidence, could raise his impairment rating of her concentration and persistence of pace and social functioning up to the marked level. (Tr. at 63).

### d. *Vocational Expert's Testimony*

Ms. Hartman, a vocational expert ("VE"), testified that Plaintiff previously worked as a grocery bagger, room service clerk, cashier, and waitress. (Tr. at 64-67). The VE opined that Plaintiff's work as a waitress and other similar work was either "unskilled or at the lowest level of semiskilled," and was "light to medium in strength level." *Id*. The room service and cashier work was at the light strength level, with an SVP of 2. (Tr. at 67). The waitress job had the highest SVP level of 3, while the grocery bagger job had the heaviest strength level of medium. *Id*. The VE testified that Plaintiff's earnings record did not indicate any period of substantial gainful activity and therefore there was "really no past relevant work." (Tr. at 64).

The ALJ then posited hypothetical questions to the VE, asking her to assume an individual with Plaintiff's age, education, and work experience, who could perform light work but experienced scattered periods of lost concentration rendering her off task and off pace for more than two hours at a time. (Tr. at 69). The VE opined that such an individual would be unable to maintain the jobs of a waitress or a grocery bagger. *Id*. The ALJ then asked the VE to assume that the hypothetical individual could perform light work and concentrate for at least two hours at a time; received normal breaks of fifteen minutes in the morning, fifteen minutes in the afternoon, and a lunch hour; and could concentrate the rest of the time on a consistent basis. *Id*. The VE opined that such an individual could perform simple, unskilled work, and that the job of a cashier, room clerk, and waitress would fit within those parameters. (Tr. at 70).

Plaintiff's attorney then asked the VE to consider a modified version of the second hypothetical. *Id*. The VE was asked to assume that the hypothetical person had a "marked inability to work in coordination with or proximity to others without being distracted by them due to her

paranoia," had "a marked inability to complete a normal workday without interruption from her psychologically based symptoms," and had a "marked inability to respond appropriately to changes in the work setting." (Tr. at 70-71). The VE testified that if the term "marked" meant "being unable to do those things two-thirds of the day," the hypothetical individual would not be able to perform her past relevant work. (Tr. at 71).

## C.     **ALJ's Findings**

The ALJ issued his decision denying benefits on November 16, 2007. (Tr. at 19). In his findings, the ALJ determined that Plaintiff had met the insured status requirements of the Social Security Act through June 30, 2009. (Tr. at 11). The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 12, 2005, the alleged onset date. (*Id*. at ¶2). The ALJ also found that Plaintiff had the severe impairments of schizoaffective disorder, posttraumatic stress disorder, and history of substance abuse (cocaine and alcohol) in remission since December 15, 2005. (*Id*. at ¶3). However, the ALJ concluded that these medically determinable impairments did not meet or equal a listed impairment. (Tr. at 13, ¶4).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels but was limited to repetitive work with simple one-two step instructions," and that she had the "ability to concentrate for two hours at a time and is capable of completing an 8-hour workday with two breaks and a lunch period." (Tr. at 14-15, ¶ 5). The ALJ further found that Plaintiff had no past relevant work, and that transferability of job skills was not an issue. (Tr. at 17, ¶¶ 6, 9). The ALJ also found that Plaintiff was 49 years old on the alleged onset date and was defined as a younger individual. (*Id*. at ¶ 7). She had at least a high school education and was able to communicate in English. (*Id*. at ¶8). Considering the her age, education and work

experience, the ALJ consulted the medical-vocational guidelines and found that Plaintiff could perform jobs that existed in significant numbers in the economy. (*Id.* at ¶10). Based on these findings, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act, from April 12, 2005, through the date of his decision. (Tr. at 18, ¶11).

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The burden of proof then returns to the claimant to rebut the Commissioner's showing. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

Plaintiff presents two issues for determination:

(1) Whether the Administrative Law Judge's decision that Smith's statements concerning the severity of her condition is not credible, is against substantial weight of the evidence because the reasons used to discount credibility are not supported in the record.

(2) Whether the ALJ's mechanical application of the "Grid Rule" (20 C.F.R. 404, supt. P, App. 2 s. 204.00) is an error of law.

(Pl.'s Br. at 1).

**C.** **Issue One: Credibility**

Plaintiff first contends that the ALJ's credibility assessment is not supported by substantial evidence. (Pl. Br. at 5).

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944

F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

Plaintiff raises three objections to the ALJ's credibility assessment. She first contends that the ALJ's reasons for finding Plaintiff not credible conflict with the medical record and the testimony of the ME at the hearing. (Pl. Br. at 6-7). Plaintiff specifically objects to the ALJ's finding that Plaintiff does well when she is compliant with her treatment. (Pl. Br. at 7; *see* Tr. at 16). Plaintiff argues that the medical records consistently show that she still hears voices and has trouble sleeping while on medication. (Pl. Br. at 7) (citing Tr. at 262, 273, 277, 279, 283, 287, 345, 348). The medical record cites to at least two instances of non-compliance with Plaintiff's medications as well as instances where her symptoms seemed to get worse. (Tr. at 275, 285). For the most part, however, medical records show that Plaintiff's symptoms improved when she was taking her medication. For example, in a psychiatric evaluation, conducted by ABC in June 2005, Plaintiff reported that before her drug relapse, she was taking psychiatric medications and that they had "worked very well for her and [had] stabilized her mood and symptoms." (Tr. at 293). Plaintiff's testimony further pointed out that because of her medications, her hallucinations had ceased and the voices in her head as well as her manic cycle had improved. (Tr. at 41, 44, 35). Therefore, the ALJ's finding that when "Plaintiff

is compliant with her medication she does well" is supported by substantial evidence. Even if there were conflicts in the evidence, it is the ALJ who resolves evidentiary conflicts, not the Court. *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

Second, Plaintiff argues that the ALJ's assessment of Plaintiff's social functioning is flawed. (Pl. Br. at 7). Plaintiff relies on *Cooper v. Bowen*, 707 F.Supp. 260 (N.D. Tex. 1989), for the proposition that merely because she engages in some activity and social interaction does not mean that she is not disabled. *Id*. In *Cooper*, a treating physician found that a homeless person retained the RFC to sit for two hours, stand for one hour, and walk for one hour. 707 F.Supp. at 264. The ALJ disregarded this finding as "absurd" because the homeless person spent his days walking the street. *Id*. The district court found that the ALJ substituted his judgment for that of the treating physician and, in doing so, denied the reality of the life of the homeless, who have no choice but to wander the streets all day. *Cooper* is easily distinguishable from the instant case because Plaintiff has not identified any evidence from a treating physician about how her social functioning differs from the ALJ's determination. She merely presents the same evidence about her daily activities that was considered by the ALJ and asks the Court to arrive at a different conclusion, which is not the appropriate standard of review for this action. *Greenspan*, 38 F.3d at 236.

Third, Plaintiff contends that the ALJ mischaracterized the nature and extent of medical expert testimony in the administrative decision. (Pl. Reply at 1). Specifically, Plaintiff argues that the medical expert's opinion that Plaintiff had the ability to perform simple repetitive work did not justify a finding that Plaintiff can perform all aspects of unskilled work. *Id*. Plaintiff emphasizes her own testimony about her "inability to interact appropriately, on a sustained basis, with the public." *Id*. Plaintiff argues that the ALJ "discredited her testimony, in part, by relying on the medical

expert's testimony." *Id*. This argument requests the Court to reweigh the evidence, retry the issues, and substitute its own judgment for that of the ALJ, which it is not permitted to do. *Greenspan*, 38 F.3d at 236.

In sum, the ALJ properly considered the evidence in the record and applied the proper legal standards when he assessed Plaintiff's credibility. The Court therefore finds that substantial evidence supports the ALJ's credibility assessment. *Id*.

**D.**     **Issue Two: Grid Rule**

Plaintiff asserts that the ALJ committed an error of law in mechanically applying the Grid Rule despite a finding that Smith suffered from severe mental impairments. (*See* Pl. Br. at 9-11; Pl. Reply at 4).

    **1.**     **Use of Grids for Nonexertional Impairments**

To guide the determination of whether other work exists that a Social Security claimant can perform, the Commissioner promulgated medical-vocational guidelines ("Grids"). The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Grids explicitly state that they "do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional impairments."[2]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1). If impairments are solely exertional or the nonexertional impairments do not

---

[2] Under the Social Security regulations, impairments are either exertional or nonexertional. Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. All other impairments are classified as nonexertional. *Holiday v. Barnhart*, 460 F.Supp.2d 790, 806 (S.D. Tex. 2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) and 20 C.F.R. § 404.1569(a)).

sufficiently affect the claimant's RFC, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *Newton v. Apfel*, 209 F.3d 448, 458(5th Cir. 2000) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy. *Id*. Therefore, before applying the Grids, the ALJ must determine whether a claimant's nonexertional limitations significantly affect a claimant's RFC. *Newton*, 209 F. 3d at 459; *Bagwell v. Barnhart*, 338 F.Supp.2d 723, 733 (S.D. Tex. 2004).

In this case, the ALJ found at Step 2 that Plaintiff had severe impairments of schizoaffective disorder, posttraumatic stress disorder and history of substance abuse in remission since December 15, 2005. (Tr. at 11, ¶3). All of these impairments are non-exertional in nature. While none met or equaled a listed impairment, (*id*. at 13, ¶4), the ALJ found that they affected Plaintiff's RFC because he limited her to "repetitive work with simple one-two step instructions" and an "ability to concentrate for two hours at a time." (Tr. at 14-15, ¶5). The Commissioner contends that Plaintiff's nonexertional limitations were not significant. (Def. Br. at 7). The ALJ imposed restrictions on Plaintiff's RFC based on these same limitations, however. Since Plaintiff's nonexertional limitations significantly affected her RFC, the ALJ was precluded from relying upon the Grids at step 5 to determine that Plaintiff could perform other work in the economy that she can perform. *Newton*, 209 F. 3d at 458. The ALJ's step 5 finding in his written decision, however, relies exclusively upon Grid § 204.00 to find that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. at 17-18). Accordingly, the Court finds that the ALJ violated 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1) when he determined that Plaintiff could perform other work despite her

nonexertional limitations because he failed to rely upon the testimony of a VE in making this determination.

    2.    **Harmless Error**

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). A "[v]iolation of a regulation constitutes error, and will constitute a basis for reversal of agency action and remand when a reviewing court concludes that the error is not harmless." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F.Supp.2d 823, 838 (N.D. Tex. 2008) (Ramirez, Mag.) (citations omitted). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Id.*; *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).[3]

The ALJ in this case solicited the testimony of a VE at the administrative hearing. (Tr. at 64-70). At the hearing, the ALJ proposed a hypothetical person who could perform unskilled light work, could concentrate for "at least two hours at a time," and received a lunch break and two 15-minute breaks. (Tr. at 69-70). The VE testified that such a person could perform work as a waitress, a room clerk, and a cashier. (Tr. at 70). In the ALJ's written decision, he determined that Plaintiff had the RFC to perform work at all exertional levels with the additional limitations of an "ability to concentrate for two hours at a time" and "repetitive work with simple one-two step instructions." (Tr.

---

[3] A violation of a ruling, on the other hand, "may also constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation." *McNair*, 537 F.Supp.2d at 838. Prejudice and harmless error analysis, although similar in substance, are different procedurally. *Id*. Remand for failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981). A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

at 14, ¶5; Tr. at 18, ¶10).

While the RFC finding appears to be more expansive and thus encompass the limitations of the hypothetical person proposed at the administrative hearing, there are two important differences. The first difference is that the hypothetical person could concentrate for "at least two hours" whereas Plaintiff can concentrate "for two hours at a time." It is not apparent from the ALJ's RFC finding whether Plaintiff could concentrate for a minimum or maximum of two hours. The second difference is that the RFC limitation to "repetitive work with simple one-two step instructions" addresses reasoning level, whereas the VE testified about the hypothetical person's ability to perform unskilled work. Reasoning level is a division of the General Educational Development ("GED") scale used to describe the amount of education required for satisfactory job performance. *Dictionary of Occupational Titles* (4th Ed. 1991), Appx. C, *available at* 1991 WL 688702. A skill level, on the other hand, focuses on the amount of lapsed time it takes for a typical worker to learn a job's duties. *Id*. While the Fifth Circuit has not addressed the differences between reasoning level and skill level, a number of courts outside this circuit have found that they are two separate vocational considerations that cannot be used interchangeably. *See e.g.*, *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (skill level of work does not address required reasoning level); *Meissl v. Barnhart*, 403 F.Supp2d 981, 983 (C.D. Cal. 2005) (skill level and reasoning level are two separate vocational considerations). Since the two considerations are not interchangeable, the VE's testimony concerning the hypothetical person's skill level cannot be used to support the reasoning level limitation in Plaintiff's RFC.

Given these two differences between the VE's testimony and the RFC finding, the Court cannot say that the ALJ would arrive at the same conclusion had he relied on the VE's testimony in his written decision instead of the Grid Rule alone. His violation of the regulation requiring him to

rely on VE testimony to assess Plaintiff's nonexertional limitations therefore was not harmless, and remand is required. *Frank*, 326 F.3d at 622; *McNair*, 537 F.Supp.2d at 838.

### III. RECOMMENDATION

*Plaintiff's Motion for Summary Judgment* should be **GRANTED**, *Commissioner's Motion for Summary Judgment* should be **DENIED**, and the final decision of the Commissioner should be **REVERSED** and **REMANDED**. On remand, the ALJ must rely on the testimony of a VE in his step 5 determination as to whether Plaintiff can perform other work despite her nonexertional impairments.

**SO RECOMMENDED**, on this 12th day of March, 2009.

                                              IRMA CARRILLO RAMIREZ
                                              UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

                                              IRMA CARRILLO RAMIREZ
                                              UNITED STATES MAGISTRATE JUDGE